*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0795**


Jarrod Dwayne Miller, petitioner,
Appellant,

vs.

State of Minnesota,
Respondent.


**Filed April 4, 2016
Affirmed
Bjorkman, Judge**


Hennepin County District Court
File No. 27-CR-12-26380

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

        Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and

Kalitowski, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**BJORKMAN**, Judge

Appellant challenges his conviction of prohibited possession of a firearm, arguing that the district court erred by denying his motion to suppress evidence discovered during the stop of the bus he was riding. We affirm.

**FACTS**

On August 12, 2012, at approximately 11:35 p.m., D.D. called law enforcement to report a man carrying a gun on the route 19 Metro Transit bus. D.D. stated that the man showed the gun to other passengers and told them he was "out here robbing people." D.D. described the individual as a black male seated at the back of the bus, 22-23 years old, 5'7" to 5'11", 200 pounds, wearing blue jeans, a white-and-blue checkered shirt, and a blue hat with an afro hanging out of the sides. D.D. told dispatch that he got off the bus at the intersection of Olson Memorial Highway and Bryant Avenue, but the man with the gun was still on the bus, which was heading toward Penn Avenue. D.D. identified himself, provided his cell phone number, and told dispatch that he had been an informant for "narcotics downtown."

Multiple officers responded. Officer Steward was among the first to locate the already stopped bus about four minutes after D.D.'s call. Officer Steward walked around the outside of the bus and did not see anyone inside who matched the suspect's description. Officer Severance arrived shortly thereafter, parking his squad car in front of the bus. He and three other armed officers entered the bus through the front door. Officer Severance commanded the passengers to raise their hands. All but one person—appellant Jarrod

Dwayne Miller—complied with the directive. Miller lowered his hands and slid over to one side of his seat. At the same time, Officer Steward, who was still outside of the bus, saw Miller take a gun out of his waistband, drop it on the floor, and then raise his hands. Officer Steward yelled, "gun," and officers on the bus apprehended Miller. The gun was found on the floor at the back of the bus. Miller was wearing a white and purple hat with hair sticking out from under it, a gray shirt with no pattern, and blue jeans.

Miller was charged with being a prohibited person in possession of a firearm in violation of Minn. Stat. § 624.713, subd. 1(2) (2012).[1] He moved to suppress evidence of the gun on the grounds that it was obtained as the result of an unlawful seizure. The district court denied the motion and the matter was tried to a jury. Following his conviction and imposition of a 60-month sentence, Miller appealed. We remanded with instructions for the district court to decide: (1) whether the 911 call was anonymous, (2) whether police sufficiently corroborated the caller's information before conducting the *Terry* stop, and (3) whether there was reasonable, articulable suspicion that criminal activity was afoot. *State v. Miller*, No. A13-2067, 2014 WL 4388620, at *2 (Minn. App. Sept. 8, 2014), *review denied* (Minn. Nov. 25, 2014). After a supplemental evidentiary hearing, the district court again denied Miller's suppression motion. Miller appeals.

---

[1] Miller acknowledges that he was not eligible to possess a firearm because of a prior felony conviction.

**D E C I S I O N**

The United States and the Minnesota Constitutions protect the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const., amend IV; Minn. Const., art. 1, § 10.

> [A] police officer may temporarily detain a suspect without probable cause if (1) the stop was justified at its inception by reasonable articulable suspicion, and (2) the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place.

*State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (quotations omitted). To justify a stop, an officer must have more than an unarticulated hunch. *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000). Rather, the officer "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* (quotation omitted). Courts consider the totality of the circumstances to determine whether the police had a reasonable basis for the stop. *Id.*

We review a district court's factual findings for clear error and its legal determinations de novo. *State v. Zornes*, 831 N.W.2d 609, 621 (Minn. 2013). When the facts are not in dispute, we independently review them to determine, as a matter of law, whether the evidence should be suppressed. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992).

Miller argues that the information D.D. provided to law enforcement was not sufficiently reliable to create a reasonable suspicion of criminal activity. And even if the information was reliable, Miller asserts that reasonable suspicion was dispelled because no passenger on the bus matched the suspect's description. We address each issue in turn.

4

**I.** **The information provided by D.D. was sufficiently reliable to create a reasonable suspicion of criminal activity.**

Information provided by a private citizen may create reasonable suspicion of criminal activity to warrant an investigative stop if the information has sufficient indicia of reliability. *In re Welfare of G.M.*, 560 N.W.2d 687, 691 (Minn. 1997). Tips from private citizens are presumed to be reliable, particularly when they give information about their identity so that the police can locate them if necessary. *State v. Davis*, 732 N.W.2d 173, 182-83 (Minn. 2007); *State v. Lindquist*, 295 Minn. 398, 400, 205 N.W.2d 333, 335 (1973) ("One who voluntarily comes forward and identifies [himself] is more likely to be telling the truth because [he] presumably knows that the police could arrest [him] for making a false report.").

Miller argues that because D.D. previously worked as an informant, his reliability is not presumed and must be assessed using the six factors we articulated in *State v. Ross*, 676 N.W.2d 301, 304 (Minn. App. 2004).[2] We are not persuaded. *Ross* presented the questions of how to determine the reliability of a confidential informant, and whether

---

[2] The six factors described in *Ross* are:

> (1) a first-time citizen informant is presumably reliable; (2) an informant who has given reliable information in the past is likely also currently reliable; (3) an informant's reliability can be established if the police can corroborate the information; (4) the informant is presumably more reliable if the informant voluntarily comes forward; (5) in narcotics cases, "controlled purchase" is a term of art that indicates reliability; and (6) an informant is minimally more reliable if the informant makes a statement against the informant's interests.

676 N.W.2d at 304.

information provided by the informant was sufficient to establish probable cause for a warrantless search. *Id.* at 303-304. That is not the situation here. D.D. was not acting in the capacity of a confidential informant when he contacted law enforcement. Although he initially called an officer with whom he previously worked, he was immediately transferred to dispatch. Once D.D. was transferred to dispatch, he reported the details of the criminal activity he observed on the bus before mentioning his prior work as an informant. On these facts, we conclude that D.D was acting as a private citizen informant, and his credibility is presumed. *Davis*, 732 N.W.2d at 182. His credibility was bolstered because he gave his name and phone number to dispatch. *Id.* at 183 (stating that a private citizen is particularly reliable when the informant provides identifying information). Accordingly, the information D.D. provided to law enforcement was sufficiently reliable to create a reasonable suspicion that criminal activity was occurring on the bus.

## II. Reasonable suspicion of criminal activity was not dispelled before the police seized Miller.

As stated above, an officer may "stop and temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *Diede*, 795 N.W.2d at 842 (quotation omitted). But if reasonable suspicion is dispelled by police investigation prior to the seizure, a seizure is not justified. *Britton*, 604 N.W.2d at 88.

Miller initially argues that two seizures occurred—when officers initially stopped the bus and again when they entered the bus with their guns drawn. A seizure occurs when an officer, by means of physical force or show of authority, has in some way restrained the

liberty of a citizen. *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999) (stating that a person is seized if, in view of the surrounding circumstances, a reasonable person would believe he or she was not free to disregard the police or terminate the encounter). Regardless of whether the initial stop of the bus was a seizure, we agree that a seizure occurred when four officers entered the bus, drew their weapons, and commanded the passengers to raise their hands. Such action was an assertive showing of authority by the officers, and no reasonable person on that bus—including Miller—would have felt free to disregard the officers or terminate the encounter.[3] It was only after the officers boarded the bus that Miller grabbed the gun from his waistband and dropped it on the floor. Accordingly, our analysis turns on whether the officers were justified in entering the bus to seize its passengers.

Miller asserts that when Officer Steward looked into the bus and did not observe anyone who matched the description of the suspect, reasonable suspicion that the suspect was still on the bus was dispelled. We disagree. In *Britton*, an officer stopped a vehicle that he suspected was stolen because the driver-side rear passenger window was broken. 604 N.W.2d at 86-87. Prior to stopping the vehicle, the officer checked his computer and learned that the vehicle was not listed as stolen. *Id*. at 86. The supreme court held that the computer check did not completely dispel the officer's suspicion of criminal activity because it was possible that the vehicle was stolen but had not yet been reported. *Id*. at 87-

---

[3] We note that in the interest of officer and passenger safety, it was reasonable for the officers to draw their weapons and command the passengers to raise their hands because the officers had been informed that the suspect was armed. *See State v. Balenger*, 667 N.W.2d 133, 139 (Minn. App. 2003) (stating that the nature of an intrusion is balanced against the governmental interest in crime prevention and legitimate concerns of officer safety), *review denied* (Minn. Oct. 21, 2003).

7

88. Similarly, when Officer Steward arrived at the scene, he looked into the bus and did not see anyone who matched the description provided by D.D. But this observation did not dispel all suspicion that the suspect was on the bus. While it was possible that the suspect got off the bus during the four minutes between D.D.'s report and the seizure, it was equally possible that the suspect was still on the bus but had ducked down to avoid detection or was in a location that Officer Steward could not observe from his position outside of the bus.

Moreover, it is not necessary for a suspect to match every aspect of a description to justify a temporary seizure. *See United States v. Martinez*, 462 F.3d 903, 906 (8th Cir. 2006) (upholding an investigatory stop where person generally matched the physical description of the suspect except for the color and style of shirt); *State v. Yang*, 774 N.W.2d 539, 552 (Minn. 2009) (holding that officer reasonably stopped a dark blue Honda Civic hatchback based on a description of a black Honda Accord). Miller matched several aspects of the description provided by D.D. He is a black male, was seated at the back of the route 19 bus, was wearing blue jeans and a hat, and had hair sticking out from under the sides of his hat. Although Miller's hat and shirt did not exactly match the description, the lack of precision did not render the stop unreasonable.

In sum, Officer Steward's observations prior to the officers boarding the bus did not dispel the reasonable suspicion of criminal activity on the bus. The officers were acting on much more than a hunch when they boarded the bus to determine whether the armed suspect was still on board. *See State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (stating that the standard for reasonable suspicion is not high, but requires more than an

8

inchoate or unparticularized suspicion or hunch).  Because we conclude the seizure of the bus passengers was valid, and the gun was discovered in connection with a lawful seizure, the district court did not err by denying Miller's suppression motion.  Because Miller does not separately challenge the jury's verdict, we affirm.

**Affirmed.**